IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STEPHANIE SIMS,

              *Plaintiff*,

   v.

PEACE OF MIND LIVING HABILITATIVE
SERVICES, LLC, *et al*,

              *Defendants*.

Civil Action No. 2:19-cv-413

Hon. William S. Stickman IV

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM S. STICKMAN IV, United States District Judge

      Plaintiff Stephanie Sims ("Sims") claims she is entitled to damages after being retaliated against by her former employer, Peace of Mind Living Habilitative Services, LLC ("Peace of Mind"), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. Specifically, at Count II, Sims claims that she was retaliated against for reporting that Defendant Philip Hunter ("P. Hunter") kissed her, which she contends was an unlawful touching. Peace of Mind denies that it retaliated against Sims. At Count III, Sims also makes an intentional tort claim for battery under Pennsylvania law against P. Hunter and Peace of Mind, which Defendants deny. A nonjury trial was held on August 23, 2021. Following its conclusion, the Court permitted both parties to file Proposed Findings of Fact and Conclusions of Law.

      The Court hereby makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 52.

## I.   Findings of Fact

1.     Peace of Mind is a direct care business.  Direct care staff help clients who are facing physical or mental challenges with their daily living activities, such as taking medicine, preparing meals, cleaning, and doing errands such as shopping and attending doctor appointments.

2.     Amara Hunter ("A. Hunter") has served as CEO of Peace of Mind since it was established in 2014.  (ECF No. 87, pp. 60, 166).

3.     P. Hunter is A. Hunter's father and served as Peace of Mind's Chief Compliance Officer.  (ECF No. 87, p. 177).

4.     Lazaven Mitchell ("Mitchell") was the Chief Operating Officer of Peace of Mind.  (ECF No. 87, p. 60).

5.     Mitchell dated A. Hunter (between 2009 and 2012) and, later, dated Sims.  (ECF No. 87, pp. 95, 171).

6.     Sims began working with Peace of Mind on October 20, 2017.  (ECF No. 87, p. 47).

7.     Sims testified that she initially earned $12.00 per hour, but her pay was later increased to $14.00 per hour.  (ECF No. 87, p. 59).

8.      She testified that she worked 40 hours per week, plus overtime.  (ECF No. 87, pp. 47-48).

9.     Sims was primarily assigned to a Peace of Mind client named Faith Ellis ("Ellis"), although she occasionally provided support to other clients.  (ECF No. 87, pp. 48-49, 60).

10.     Sims described Ellis, as well as other clients with whom she worked (namely "Zach" and "Kee"), as occasionally acting in an "aggressive" manner.  (ECF No. 87, p. 67).

11.     At least initially, Sims and Peace of Mind seemed to be a good fit.  Sims even recommended her mother and sister for employment, and they were hired.  (ECF No. 87, p. 65).

12.     Shortly after starting work for Peace of Mind, Sims and Mitchell began dating. (ECF No. 87, pp. 59-60).

13.     Sims testified that, at first, Peace of Mind management knew about and encouraged the relationship.  (ECF No. 87, p. 31).  In fact, Plaintiff's Exhibit 3 is a text message from A. Hunter referencing the relationship and even discussing renting an apartment to Sims and Mitchell.

14.     In late-December 2017, after Sims and Mitchell began dating, Peace of Mind enacted an anti-fraternization policy.

15.     This policy was enacted upon the advice of Cynthia Garfold ("Garfold"), President of Pay-A-Way, Inc., a business that provided payroll and human resources support to Peace of Mind.  (ECF No. 87, pp. 105-07).

16.     In light of the testimony of record, the Court finds that the most credible explanation for the enactment of the anti-fraternization policy was that Ellis reported seeing Sims and Mitchell having physical contact in her residence and that A. Hunter learned that Sims was sharing details about her relationship with Mitchell with other employees.  (ECF No. 87, pp. 183-84; Defendants' Exhibit 5).  The testimony is not entirely clear as to exactly when A. Hunter learned of the contact between Sims and Mitchell at Ellis's residence, but the Court holds that the record supports a finding that (a) the physical contact between Sims and Mitchell was reported by Ellis (which is entirely consistent with the portrait of her character as painted by Sims and other witnesses); and that (b) A. Hunter implemented the anti-fraternization policy in response to this incident and other related concerns after consulting with Garfold.

17.     On December 26, 2017, A. Hunter sent an email to Garfold that stated:

3

> Hi Cindi,
> Hope you enjoyed your holiday. I wanted to bring something to your attention and ask for your assistance. Lazaven has been found to have been having an intimate relationship with a Direct Care Staff. This DCS has evidently been sharing with other staff details about their relationship. When Lazaven was confronted, he didn't deny his relationship with her. I informed him that I did not feel comfortable with this relationship within the agency between management and direct care staff. At this time, he is not willing to end the relationship. I am not sure what I need to do. Are you able to meet with either me or the both of us to give us your professional opinion and advice regarding this matter. I am questioning if I need to take him out of the manager position.

(Defendants' Exhibit 5).

18.     A. Hunter also included in the email a copy of the anti-fraternization policy that she intended to enact.

19.     The Court understands that there is some inconsistency between what A. Hunter wrote to Garfold and what she testified vis-à-vis what prompted her sudden (as of late 2017) desire to promulgate an anti-fraternization policy. Reviewing the evidence in context and having observed and listened to the witnesses, the Court believes that there was an incident where Ellis reported seeing Mitchell and Sims displaying affection and it was brought to A. Hunter's attention. The Court believes and finds that A. Hunter was concerned about the somewhat erratic and difficult personality of Ellis and that she would make a formal complaint which could, as described by Garfold, potentially have to be reported to state regulatory authorities (depending on the nature of the complaint). Thus, the Court believes that A. Hunter's email to Garfold was less than forthcoming about the impetus for the anti-fraternization policy (referring to other Peace of Mind caregivers, rather than any complaint from Ellis). Nevertheless, the Court holds that the reason A. Hunter promulgated the anti-fraternization policy is, ultimately, immaterial to the disposition of Sims's claims.

4

20.    After Sims and Mitchell were informed of the anti-fraternization policy, Mitchell quit his employment with Peace of Mind. (ECF No. 87, p. 70). Sims was concerned about her job and whether "there was going to be a write up." (ECF No. 87, pp. 70-71).

21.    Sims, Mitchell and P. Hunter had a telephone conversation about the anti-fraternization policy. Although Sims initially testified that this conversation was "maybe two days before [the kissing incident]," (ECF No. 87, p. 71), she later clarified that the telephone conversation was the day before P. Hunter kissed her. (ECF No. 87, p. 72).

22.    P. Hunter gave a statement in which he said that the conversation lasted about forty-five minutes and that he "promise[d] her that [he] would look into her situation at work and that [he] would do whatever [he] could to help save her job." (Plaintiff's Exhibit 7).

23.    The next day, December 28, 2017, Sims was scheduled to work with Ellis at her residence in Monroeville. Her shift was scheduled to begin at 3:00 p.m., but she started working at approximately 4:00 p.m. when Ellis returned from visiting with her family. Sims did not have keys to Ellis's apartment, so she waited in the hallway. (ECF No. 87, pp. 5-6).

24.    Sims testified that Ellis arrived with P. Hunter. Ellis greeted her and proceeded to unlock her door. At this point, Ellis was in front of her and P. Hunter was behind her. Sims felt P. Hunter's breath on the back of her neck and on the side of her face. As she turned her head, P. Hunter kissed her on the cheek.

25.    P. Hunter admits that he kissed Sims. He denies that it had any sexual intent. In his written statement, he said that he initially gave Ellis a "light peck on her cheek" as he was saying goodnight. He continued, "Stephanie was in close proximity to us so I said goodnite [sic] and gave her a light peck kiss on her cheek as well." (Plaintiff's Exhibit 7). In the same written statement, he provided a second, somewhat inconsistent, account of what happened. He recounted

that it was the first time he saw Sims since their phone conversation and that she "seem[ed] to be down in her spirit." Moreover, he stated, "I could see that she wasn't happy while not wanting to engage in conversation in front of the client, I leaned over from [Ellis] and whispered to that not to worry [sic] I was working on her situation and with a pecking type kiss on upper cheek near her forehead and she smiled and said thank you!" (Plaintiff's Exhibit 7).

26.     P. Hunter denies that he, as Sims recounted, snuck up behind her and breathed on her neck before kissing her. He testified that he thought the kiss was appropriate and that he viewed Sims and other younger employees like his daughter. (ECF No. 87, p. 276). He characterized the kiss as a "peck of endearment and of being generous to say good night." (ECF No. 87, p. 282). He admitted that he never kissed Sims before.

27.     While P. Hunter's statement recounts that Sims said "thank you" after the kiss, Sims gives a very different account of what happened. She testified that after the kiss, she ran into Ellis's bathroom. She stated, "I went to the bathroom as soon as possible because I didn't know if he was going to grab me or anything at that point. Like I never had this encounter or any—like we never even shook hands before. So I was feeling scared." (ECF No. 87, p. 7).

28.     In weighing and comparing the contradictory accounts of the kiss and its aftermath (including the internal contradictions of P. Hunter's own statement), the Court credits Sims's account over that of P. Hunter. The Court finds that P. Hunter suddenly and without consent (either verbal or implied) kissed Sims from the side. P. Hunter intended to kiss Sims (as he admitted). He did so knowing that he did not customarily kiss Sims or receive any indication from her that a kiss was permitted, expected or welcome. Indeed, the kiss was not welcomed by Sims or understood by her to be a "peck of endearment" or a "generous" way to say goodnight. Nor does the Court credit P. Hunter's statement that Sims thanked him afterward (for the kiss or the alleged

6

statements he made about her job).  Rather, the Court finds that the record supports Sims's testimony that she immediately became upset and fled from P. Hunter.

29.    Plaintiff's Exhibit 2, a series of texts between Sims and P. Hunter, support her account.  In these texts, P. Hunter acknowledges that Sims was upset about the kiss.  He stated:

> Hey Stef I am so sorry, I did not man you any ham to you [sic], I only wanted to assure you that you should feel comfortable returning to work.  After talking with you when you called me that night hearing the pain in your voice, as father with daughters my heart went out to you.  I resect [sic] your feelings and I was wrong to assume you would know that I only meant well.  Please except my deepest apologies to you.

Sims replied:

> Sorry that wasn't welcoming to me I felt assaulted and you should be fried [sic] or demoted as well.  Fired.

30.    The Court does not know what P. Hunter's motivation was in kissing Sims.  For the claims before the Court, his motivation is immaterial because the record clearly and unequivocally supports the finding that he intended to kiss her.  The Court concludes that the kiss was not expected or welcomed by Sims and that she immediately made that known to Peace of Mind.

31.    Sims reported P. Hunter's actions to A. Hunter.  A series of text messages from Sims to A. Hunter sent within the hour that the kiss occurred stated:

> -    Do u mind dropping off toilet paper
>
> -    Also please tell ur dad I don't feel comfortable with him kissing me
>
> -    On the cheek I'm not his family or friend
>
> -    I want to make a fuckin complaint thank you.

(Plaintiff's Exhibit 6).

32.      A. Hunter responded that she would let Betty Hunter ("B. Hunter"), her mother and

P. Hunter's wife, handle the complaint.  Sims responded that she would be biased and would not

handle the matter properly, to which A. Hunter responded that the HR department would handle

it.  (Plaintiff's Exhibit 6).

33.      An investigation was conducted by Charles Gravante ("Gravante"), Peace of

Mind's Human Resources Director.  During the investigation, P. Hunter was suspended.  (ECF

No. 87, p. 210).

34.      In an undated letter to Sims, A. Hunter explained the investigation and its

conclusions.  It states, in relevant part:

> In response to your complaint reported and filed on December 28, 2017 with the
> agency's Human Resources Representative, Mr. Charles Gravante, Mr. Gravante
> referred this matter to Peace of Mind Living Habilitative Services LLC's Policy
> and Procedures Review Committee who were able to review your written complaint
> form, review statements from Mr. Gravante's interview with you, and also
> interview other relevant third parties regarding this alleged incident.
>
> As a result of the investigation, the committee found the complaint to be
> **"Inconclusive"** based on the statements from the accuser and the targeted
> employee.  The targeted employee denies any claims of sexual harassment and
> provided a statement contrary to the accuser's statement.

(Plaintiff's Exhibit 8).

35.      Notwithstanding the "inconclusive" finding of the investigation, Peace of Mind

imposed restrictions upon P. Hunter:

> As of December 28, 2017, the targeted employee Mr. Philip Hunter, has been
> removed from all assignments at any site(s) where the accuser, Ms. Stephanie Sims,
> may be present working until this incident is closed.  After this incident is closed,
> the committee has determined the requirement that Mr. Philip Hunter will need to
> be accompanied by another agency official from the management staff, when in
> Ms. Stephanie Sim's presence.  The committee has also recommended ongoing
> trainings on the workplace policies.  Both the accuser, Ms. Stephanie Sims and the
> targeted employee, Mr. Philip Hunter will be required to review and sign off on the
> agency's Sexual Harassment Policy.

(Plaintiff's Exhibit 8).

36.     Sims continued to work at Peace of Mind after the kiss incident of December 27, 2017.

37.     An incident occurred on January 11, 2018, while Sims was on duty at Ellis's apartment.

38.     While Ellis was sleeping, her boyfriend called her on the telephone and Sims did not wake her to take the call. Sims testified that she did not wake Ellis because "I knew she would get aggressive. But I never would tell her she couldn't have a phone call. That's one of the things, she liked to be on the phone, you know. If she was up. But I would never refuse the phone call from her, but I just knew not to wake her up because I know it would cause aggression." (ECF No. 87, p. 34). Sims testified that on multiple previous occasions Ellis became aggressive when woken from sleep. (ECF No. 87, pp. 34-35).

39.     When Ellis awoke and discovered the missed call, "she got really angry, started calling me names and throwing things, saying that she didn't want me to work there no more. Just it's her normal attitude. She's like that a lot whenever, you know, she didn't have her way." (ECF No. 87, p. 35).

40.     Sims testified that after the January 11, 2018, incident, she continued to work with Ellis for a couple of days but was then reassigned to a more aggressive client who lived in Monroeville. (ECF No. 87, p. 39).

41.     A. Hunter testified that when she initially learned of the incident, she did not immediately believe that it was the type of complaint that must be reported to the state as a "rights violation." She explained:

> I didn't believe it was a rights violation that needed to be entered because, from what my training has been of like individual rights, it's been if a staff refuses the

9

individual right to food or right to engage in activity, right to go out into the community.  Based off of the reports that I got from Faith and also spoke to Stephanie that same night, Faith—it just didn't seem like a violation of rights.  To me it was Ms.—well, a misinterpretation of what Faith had wanted Stephanie to do while she was asleep and the boyfriend called.  So you know, I do believe that Stephanie Sims was doing the right thing by letting Faith sleep and not waking her up.  I believe that's why I didn't put that in as a violation.

(ECF No. 87, p. 215).

42.    A "rights violation" reported by a client must be reported to the Pennsylvania Department of Human Services Office of Developmental Programs within twenty-four hours of the direct care provider's becoming aware of it.  (ECF No. 87, p. 216).

43.    Garfold, in addition to working as a payroll and human resources contractor, also serves as an investigator for the Office of Developmental Programs and has investigated allegations of rights violations by clients of Peace of Mind.  The Court has carefully considered her testimony relating to state reporting and investigation requirements and finds it to be credible and instructive.

44.    Violations that must be reported include, but are not limited to, allegations of psychological abuse, physical abuse, and medication errors.  (ECF No. 87, p. 113).

45.    To the extent that any violation of rights is alleged, an investigation is required and the accused must be removed from "not only that person [(i.e., the accuser)] but every other individual in your care."  (ECF No. 87, p. 113).  The suspension remains in place until the investigation is finalized.  (ECF No. 87, p. 114).

46.    Because A. Hunter did not initially believe that Ellis's complaint was a rights violation, she did not report it to the state or initiate an investigation when it occurred on January 11, 2018.

47.     However, she honored Ellis's request and removed Sims as her direct care provider. A. Hunter testified that she believed it would have been a violation of Ellis's rights if she tried to persuade her to allow Sims to continue working with her.  (ECF No. 87, p. 254).

48.     Sims testified that she had no reason to disbelieve that Ellis requested to have her removed.  (ECF No. 87, p. 79).

49.     Sims was not dismissed by Peace of Mind after being removed from her assignment with Ellis, but she was transferred to other clients.

50.     The pay records for Peace of Mind show that Sims missed one day of work following the Ellis incident.  Although the record was marked "administrative leave" by A. Hunter, her testimony clarified that this was not a formal leave, but rather a function of the fact that, after the unforeseen removal of Sims from working with Ellis, there was not a client to place her with on January 12, 2018.  (Defendant's Exhibit 22); (ECF No. 87, p. 218).  A. Hunter was able to place Sims with other clients beginning the following Monday, January 15, 2018, and Sims returned to work.  (Defendant's Exhibit 22); (ECF No. 87, p. 218).

51.     Sims worked one day with a client named "Zach."  She was then transferred to work with a client whose name was Shakeeta ("Kee") Murphy.  She remained with Kee for the remainder of her employment with Peace of Mind.  Kee was a difficult client to work with and, in fact, required the assistance of two direct care staff.

52.     On or around January 18, 2018, Sims was placed on administrative leave unrelated to the Ellis incident.  (ECF No. 87, p. 40).

53.     Sims testified that she was late for work because of an issue with her car's battery. She testified that she was written up for being late.  (ECF No. 87, p. 52).

54.     The record reflects a more complex explanation for the write-up and calls into doubt Sims's account of what happened.  A. Hunter testified that Sims did not arrive late for work, but called off. (ECF No. 87, p. 219).  The pay records support A. Hunter's account showing that Sims did not work any hours on January 18, 2018.   (Defendants' Exhibit 22).

55.     A. Hunter testified that "at the time [Sims] called off, she became very aggressive, started cursing at me and questioning my direction for her.  That became a write-up.  So Charles Gravante was responsible for that write up.  So his notes [sic] he put unpaid administrative leave.  But in my notes I put call-off due to car." (ECF No. 87, p. 219).

56.     The write up, dated January 17, 2018, states:

On January 17, 2018, employee Stephanie Sims contacted Chief Executive officer Amara Hunter to engage in a verbal altercation after being told she would need to provide a statement invoice from AAA stating the time of her call and if they responded or not to her call. Ms. Sims accused Ms. Hunter of being stringent on her regarding this request. Ms. Hunter explained the reason for this request. Ms. Sims escalated her anger and began using curse words while conversing with Ms. Hunter. This time of behavior was unprofessional and will not be tolerated. All employees are expected to maintain a professional work ethic and environment at all times, which is conductive to PML's expectations. Any further incidents of this nature are subject to disciplinary action up to and including termination of employment.

(Defendants' Exhibit 17); (ECF No. 87, p. 221).

57.     Based upon this write up, Gravante pursued disciplinary action.  (ECF No. 87, p. 222).  Pay records reflect that Sims did not work the next two days, January 18, 2018 and January 19, 2018.

58.     Defendants' Exhibit 18 supports the fact that Sims took exception to being asked to document her car issue.  Sims texted to A. Hunter:

-   I feel like ur retaliating against me by removing me from the clients

-   home I worked with, making ur mother my supervisor after he sexually

- harassed me and now you don't believe I had an issue with my car!  Just

- stop I can't deal with this no more! I'm at my limit with this

- company!

- *After ur father sexually harassed me

- Then u never responded to how I felt about the outcome investigation but Theo my [sic] thing u can think of is emailing me about AAA! Leave me alone.

(Defendants' Exhibit 18).

59.    The record creates a reasonable inference that Sims was informed of her administrative leave before reporting for work on the afternoon of January 18, 2018.  She reached out to Gravante via texts:

- (Sims) Please give me something in writing referencing my administrative leave.  How long and the terms.  Thank you.

- (Gravante) Unpaid administrative leave until the investigation is finalized.

- (Sims) Don't you have a formal administrative leave letter stating the terms or anything?  Or is this it?

- (Gravante) At this time, this is all I can provide you.

(Defendants' Exhibit 19).

60.    Immediately following, on Monday, January 22, 2018, A. Hunter reported the Ellis incident to authorities.  After an eleven-day delay, the report was filed by A. Hunter because "Ms. Ellis didn't let it go.  Even though Ms. Sims was removed, Ms. Ellis still had complaints about her experience with Ms. Sims to where she was going to report it to her coordinator.  So I took proactive actions and just went ahead and filed it myself." (ECF No. 87, p. 226).

61.    A. Hunter sent an email reporting the incident to Beth Phillips, with Washington County. It stated:

Hi Beth,

13

I wanted to inform you that F[redacted] had contacted me, very upset, on Thursday, January 11, 2018, stating that her DCS, Stephanie Sims, did not allow her to speak to her boyfriend on the phone that evening. F[redacted] said that she was asleep during the time of the call, but that Stephanie could have woke her up. F[redacted] also stated that she and Stephanie engaged in a verbal altercation with cursing involved on both ends. F[redacted] stated that Stephanie called her boyfriend an inappropriate name. F[redacted] stated that Stephanie left the home by slamming the door when the next shift arrived. F[redacted] then requested for Stephanie not to work with her again after this night.

As of date, we removed Stephanie from F[redacted]'s home effective January 11, 2018. I didn't realize that this was a rights violation due to the nature of the incident. I am now just putting it in the HCSIS. I will email you with an incident report.

Thank You!

Amara T. Hunter, MSW Chief Executive Officer

(Plaintiff's Exhibit 10).

62.     A. Hunter entered the incident on the Commonwealth of Pennsylvania's EIM

(Enterprise Incident Management) System. (Defendants' Exhibit 21).

63.     The narrative of the report states:

This incident was originally filed as an internal incident by the agency, but due to increasing information by the individual, FE, the agency decided to file that report as a formal incident through the EIM system.

On January 11, 2018 around 10:45 pm, FE, contacted AH, CEO of the agency to report that she and her direct care staff, SS, had engaged in a verbal altercation that was initiated by the incident of SS not waking up FE when FE's boyfriend called the house phone. FE stated that SS knew to wake her up if her boyfriend called the house for her. FE reported that SS stated to her that it was too late for FE to receive phone calls and reprimanded her for her boyfriend calling at this time in the evening. FE reported that the boyfriend called the home around 9:30. FE stated that when she woke up after 10:00 pm and contacted her boyfriend, that is when she found out what had happened from the boyfriend. FE stated that the boyfriend told her that he had called the house phone and that the worker said that FE was sleeping and said to him not to call the house this late again. FE stated that she confronted SS after hearing this information and that they quickly began arguing about this incident. When SS shift was over, FE stated that she left the home using curse words and slammed the door. FE requested for SS not to return back to FE

home after January 11, 2018.  FE now has a new direct care staff who she states
she likes more and feels more comfortable with.

(Defendants' Exhibit 21).

64.     As required by state policy, Sims was not permitted to work after the report was
filed and the investigation initiated.  A. Hunter confirmed that, pursuant to that policy, "she should
have been removed."  (ECF No. 87, p. 237).

65.     Nevertheless, pay records show that Sims worked a full day on January 24, 2018—
two days after the report was filed.  A. Hunter testified that this day was "training" because
"whenever an incident is reported in the EIM system, the state requires you to explain to them how
this will never happen again.  And so we had to show that we provide training to Stephanie Sims
regarding that violation of rights."  (ECF No. 87, p. 238).  Sims was supervised that day by B.
Hunter, Gravante and a new manager named Darieth.

66.     Other than the Ellis incident and the incident relating to her car, Sims received no
other discipline.  A. Hunter testified that initially "[h]er rapport with the staff, her rapport with the
individuals, rapport with me was very positive."  However, "[a]fter the incident with Mr. Mitchell,
her attitude changed.  It went negative.  The ally that I used to have, like the allied relationship that
I used to have with Ms. Sims was no longer there.  I just started receiving more reports of a bad
attitude from the staff and the clients after that incident occurred with Mr. Mitchell leaving."  (ECF
No. 87, p. 240).

67.     Sims voluntarily left employment with Peace of Mind on January 25, 2018.  (ECF
No. 87, p. 84).  She testified that she quit because she did not feel safe because P. Hunter would
show up at locations where she was working.  (ECF No. 87, pp. 46-47).

68.     After being unemployed for one week, Sims was hired by Landmark Home Health
Care in a full-time position earning $14.25 per hour, more than the $14.00 per hour she testified

15

she earned at Peace of Mind.  However, she did not work overtime for Landmark.  (ECF No. 87, pp. 52-54).

69.     The record shows that Peace of Mind later had its license suspended for having too many reported "violations" and "incidents."  (ECF No. 87, p. 139).

## II.     Conclusions of Law

### A.  Retaliation Claim – Count II

1.     Peace of Mind did not retaliate against Sims for her report of a kiss by P. Hunter.

2.     Section 704(a) of Title VII of the Civil Rights Act of 1964 states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees... because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

3.     Retaliation claims are analyzed pursuant to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006).

4.     The first step involves evaluating a plaintiff's *prima facie* case.  *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008).  To state a claim of retaliation under Title VII, a plaintiff has to prove the following by a preponderance of the evidence: (1) that she engaged in conduct protected by Title VII of the Civil Rights Act of 1964; (2) that she was subjected to an adverse employment action at the time, or after, the protected conduct took place; and (3) that the employer took an adverse action against her because of her protected conduct.  *See Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008).

5.     The Third Circuit has instructed with regard to the first prong:

With respect to "protected activity," the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the "participation clause") and those who oppose discrimination made unlawful by Title VII (the "opposition clause"). *Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006). Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII. *Clark County v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (rejecting retaliation claim where "[n]o reasonable person could have believed that" the underlying incident complained about "violated Title VII's standard" for unlawful discrimination); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (retaliation plaintiff must "act[ ] under a good faith, reasonable belief that a violation existed"). Moreover, the employee's "opposition" to unlawful discrimination must not be equivocal. *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995).

*Moore*, 461 F.3d at 341.

6.      As to the second element of the *prima facie* case, the "adverse action" element of a Title VII retaliation claim need not rise to the level required for a disparate treatment claim. *Id.* ("[T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." (citation omitted)).   Instead, in the retaliation context, a plaintiff need only show "that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (citation omitted).

7.      "To establish the third element of the *prima facie case*, . . . a plaintiff must show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 341-42. "The Third Circuit has held that "[w]here the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality." *Taylor v. JFC Staffing Assocs.*, 690 F. Supp. 2d 357, 370 (M.D. Pa. 2009).

8.      If a plaintiff establishes a *prima facie* case of retaliation, the *McDonnell Douglas* approach applies in which "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997).

9.      There is no question that Sims's reporting of the kiss by P. Hunter to A. Hunter, CEO of Peace of Mind, was protected activity, as was her participation in the investigation of P. Hunter's actions.  Thus, Sims has satisfied the first prong of her burden under the *McDonnell Douglas* framework.

10.     The next question is whether Sims has demonstrated an adverse employment action.  The record has established that there are multiple events that *may* be viewed as the requisite adverse employment action.  They include: (1) Sims's transfer of responsibility from Ellis to other clients; (2) Sims being placed on administrative leave as a result of her interaction with A. Hunter when she was late for work because of car issues; and (3) Sims being placed on administrative leave as a result of A. Hunter's late report of the Ellis incident to the state.

11.     Sims's proposed conclusions of law contend that she was "given extra tasks, micromanaged and mistreated" as a result of reporting the kiss and that these "changes" were "material and adverse compared to the original pre-complaint conditions of Plaintiff's employment with Defendant PML." (ECF No. 91, p. 21).  Sims also suggests that transferring her to the supervision of B. Hunter (P. Hunter's wife and A. Hunter's mother) was in retaliation for her complaint.

12.     The Court holds that the record does not support a finding that these factors support a finding of an adverse employment action.  Indeed, the record shows that the relationship between Sims and Peace of Mind (particularly A. Hunter) became *mutually* hostile.  The record supports a finding that this hostility originated not in Sims's report of the kiss but in the enactment of the fraternization policy, which caused her boyfriend, Mitchell, to leave employment.  Further, the record does not support a conclusion that Sims was given extra tasks or micromanaged.  Nor does the Court find that the transfer of Sims's supervision to B. Hunter to be an adverse employment event.  Looking at the record as a whole, the Court does not find that Sims proved that B. Hunter's supervision differed from her prior supervision in any material respect.  Rather, the record supports the conclusion that Peace of Mind is a small family business and that B. Hunter was made Sims's supervisor for legitimate business reasons.

13.     Nevertheless, placement on administrative leave is an adverse employment event that may support a finding of retaliation.

14.     Further, the Court holds that the transfer of Sims from Ellis to other clients is also an adverse employment event.  First, even though Sims did not lose pay and the transfer was not a demotion, a change of day-to-day tasks—even if still of same general nature—may still be considered an adverse employment action.  *See Moore*, 461 F.3d at 348 (finding that a transfer of a police officer from a district where he had earned goodwill and established good relations with the community could constitute actionable retaliation because it "is the kind of action that might dissuade a police officer from making or supporting a charge of unlawful discrimination within his squad").  Therefore, merely moving Sims from Ellis may be enough to establish a *prima facie* claim of retaliation.  Here, the record shows that the clients to whom she was later assigned were known for being even more difficult than Ellis.

15.     Sims next has the burden to establish a causal connection between the protected activity and the adverse action.  She contends that she "was placed on administrative leave on January 12, 2018—just three days after the last time she followed upon the status of the report she made against the CEO's father" and suggested the Court "deem . . . the short window of time to be unusually suggestive of retaliation."  (ECF No. 91, p. 21).

16.     Temporal proximity, also, does not establish the required causal connection.  However, "[i]n certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection."  *Marra v. Philadelphia Housing Authority*, 497 F.3d 286, 302 (3d. Cir. 2007) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d. Cir. 1997)).  What constitutes an "unusually suggestive proximity in time" is not a bright line rule, but rather, must be determined on a case-by-case basis.  In this case, Sims reported the kiss from P. Hunter on the day that it happened, December 28, 2017.  Sims was removed from caring for Ellis on January 12, 2018, just two weeks later.  She was placed on administrative leave because of the car incident on or around January 18, 2018.  The Ellis incident was reported to authorities on January 22, 2018, which required Sims to be suspended until the incident was resolved.  The Court holds that the exceptionally close proximity in time between the report of the kiss and three events that can be characterized as adverse employment actions are sufficient, in this case, to satisfy the causation requirement of Sims's *prima facie* claim.

17.     The Court must move to the second step of the *McDonnell Douglas* framework where Peace of Mind had to offer evidence that it had a legitimate, nondiscriminatory reason for the actions taken against Sims.  The Court finds that it did so.  The Court holds that the record

20

shows that each of the actions taken against Sims had a legitimate, nondiscriminatory reason completely unrelated to her report of the kiss by P. Hunter.

18.     The Court holds that the record conclusively establishes that the transfer of responsibility from Ellis to other clients was unrelated to Sims's report of the kiss.  Indeed, she continued to work with Ellis for two weeks after her report.  A substantial amount of evidence was adduced establishing that Ellis was a difficult client, could exhibit erratic behavior and could be demanding.  Sims, herself, testified as much.  The record demonstrates that there was an incident between Sims and Ellis on January 11, 2018.  The Court credits the evidence that Sims's failure to wake Ellis to take a telephone call led her to get angry, throw things and—as Sims testified—say that "she didn't want me to work there no more."  (ECF No. 87, p. 35).  The Court believes that Defendants' Exhibit 21 credibly recounts A. Hunter's understanding of the incident.  This email provides that there was a verbal altercation between Ellis and Sims and that there was "cursing involved on both ends."  Ellis also reported that Sims slammed the door when the next shift arrived. In any event, the evidence of record is uncontroverted (including Sims's testimony quoted above) that Ellis requested that Sims not be permitted to work with her any longer.

19.     The Court concludes that Sims was transferred from Ellis as a result of the verbal altercation between them, that Ellis demanded her removal, and that Peace of Mind acquiesced in order to avoid problems from the already troublesome Ellis.  A. Hunter credibly testified that she believed that it would have been a violation of Ellis's rights to try to persuade her to allow Sims to continue working with her.  Thus, the Court concludes that the transfer of Sims from Ellis to other clients was not motivated by any retaliatory purpose.  Rather, the move was made as a legitimate business response to Ellis's request.

20.     The next adverse employment event that the Court must examine is the placement of Sims on administrative leave following the dispute over her car issue.  The Court holds that there is significant credible evidence that shows that the administrative leave was a result of Sims's own conduct, rather than any illicit, retaliatory purpose.   Specifically, the Court credits the evidence that Sims behaved in a hostile and unprofessional manner when asked to substantiate her representation that she missed work due to car issues.  Having heard the testimony of both key participants in the incident (Sims and A. Hunter), the Court believes that Sims expressed hostility, including profanity, when conversing with A. Hunter regarding the car issue.   In Defendants' Exhibit 18 (a series of texts from Sims), Sims attempts to relate the discipline to her report of the kiss.  The Court holds that the record does not support that conclusion.  Rather, the evidence supports the Court's conclusion that the suspension was related only to Sims's insubordinate and unprofessional behavior.

21.     Finally, the Court must determine whether the administrative suspension resulting from the report of the Ellis incident to state authorities had a legitimate, non-retaliatory basis.  The Court holds that it does.  The Court finds that the evidence credibly establishes that a suspension is required after the submission of a rights violation to state authorities (pending the disposition of the investigation).  The Court also finds that the evidence credibly establishes that, while possibly borderline, the incident between Sims and Ellis—the failure to wake Ellis for a call coupled with the subsequent shouting match—is the type of incident that is reportable.  One remaining question is why A. Hunter waited approximately two weeks to document and submit the Ellis incident.  The Court concludes that it was not a nefarious motive vis-à-vis retaliation that motivated the late report, but rather a fear of running afoul of the regulators.  As explained above, the Court believes that A. Hunter did not immediately believe that the incident constituted a rights violation that

required formal documentation.  However, as A. Hunter indicated, Ellis would not let the incident go and kept bringing it up.  The Court concludes that A. Hunter made late documentation of the incident to avoid trouble from regulators for failure to report an incident that Ellis continued to complain about.  The Court concludes that Sims's administrative suspension following the documentation of the Ellis incident was motivated by business, rather than retaliatory, reasons.

22.     The record demonstrates that Peace of Mind had legitimate, non-retaliatory reasons for each of the adverse employment events incurred by Sims.  For each, the credible evidence of record shows that Peace of Mind's decision was not motivated by an intention to retaliate against Sims for reporting P. Hunter's kiss, but rather by legitimate business reasons relating to Sims's performance of her duties and conduct relating to her job.

23.     Since Peace of Mind came forth with legitimate, non-retaliatory reasons for its actions, the *McDonnell Douglas* framework shifts the burden back to Sims to establish that the proffered reasons were pretextual.

24.     Sims failed to meet this burden.  As explained at length above, the record demonstrates that there were legitimate, non-retaliatory explanations for each of the adverse employment actions incurred by Sims.  The Court holds that there is not sufficient evidence to support a tenable conclusion that the explanations are merely pretext.  Rather, they constitute the actual grounds for each of Peace of Mind's actions.

25.     Thus, when reviewing and weighing the evidence as a whole in light of each of the steps of the *McDonnell Douglas* analysis, the Court concludes that Sims has failed to demonstrate by a preponderance of the evidence that she was retaliated against under Title VII.

26.     The Court will enter judgment in favor of Peace of Mind and against Sims as to Count II.

**B. Battery Claim – Count III**

1.      The facts of record establish that P. Hunter committed battery.

2.      "The tort of battery has been described as an unconsented touching that is either harmful or offensive.  It is an intentional tort." *Cooper ex rel. Cooper v. Lankenau Hosp.*, 51 A.3d 183, 191 (Pa. 2012) (citations omitted).  "As traditionally stated, the elements of the tort of battery are 'a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or apprehension that such a contact is imminent." *Herr v. Booten*, 580 A.2d 1115, 1117 (Pa. Super. 1990) (quoting Prosser & Keeton, The Law of Torts 39 (5th ed. 1984)).  That is consistent with the Restatement (Second) of Torts, § 18 (explaining that "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results), as well as the battery definition included in Pennsylvania Suggested Standard Jury Instruction (Civil) 17.20 (providing that "[a] battery is an act done with the intent to cause a harmful or offensive contact with the body of another . . . and that directly or indirectly results in the harmful or offensive contact with the body of another"). *See Cooper*, 51 A.3d at 189 n.6.

3.      Battery requires an "intent to contact." *Field v. Phila. Elec. Co.*, 565 A.2d 1170, 1178 (Pa. Super. 1989).  "[T]he fact that [the defendant] did not intend to harm [the plaintiff] is immaterial.  If there is intentional contact, the consequences substantially certain to follow from such contact are within the scope of the tort." *Id.*  "The intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm.  Rather it is an intent to bring about a result which will invade the interests of another in a way that the law forbids.  The defendant

may be liable although intending nothing more than a good-natured practical joke, or honestly believing that the act would not injure the plaintiff, or even though seeking the plaintiff's own good." Prosser & Keeton, The Law of Torts 36 (5th ed. 1984). "The defendant may be liable when intending only a joke, or even a compliment, as where *an unappreciated kiss is bestowed without consent*, or a misguided effort is made to render assistance. The plaintiff is entitled to protection according to the usages of decent society, and offensive contacts, or those which are contrary to all good manners, need not be tolerated." *Id.* at 41-42 (emphasis added).

4.      The physical contact giving rise to battery need not be major or cause physical injury. Any offensive contact, however minor, constitutes a battery. *Stilley v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 968 F. Supp. 252, 259 (W.D. Pa. 1996) (applying Pennsylvania law). There need be no physical injury, but only some contact. *Brownstein v. Gieda*, 649 F. Supp. 2d 368, 375 (M.D. Pa. 2009) (applying Pennsylvania law). If the actual contact is not offensive to the plaintiff, however, there is no cause of action for battery. *Quinn v. Ltd. Exp., Inc.*, 715 F. Supp. 127, 130 (W.D. Pa. 1989) (applying Pennsylvania law).

5.      Sims has proven by a preponderance of the evidence that P. Hunter committed a battery. It is undisputed that P. Hunter kissed Sims and that he intended to do so. The record establishes that the kiss was unanticipated by Sims, that no consent was given and that the kiss was offensive to her. Sims has met her burden and proven that P. Hunter committed a battery.

6.      Sims has not proven, however, that Peace of Mind (P. Hunter's employer) is vicariously liable for that battery.

7.      Under Pennsylvania law, "a master may be held liable for the acts of the servant when those acts are committed during the course of his employment and within the scope of his authority." *Valles v. Albert Einstein Med. Ctr.*, 805 A.2d 1232, 1237 (Pa. 2002). There is no

categorial bar for intentional torts. *See Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa. Super. 1998) ("In certain circumstances, liability of the employer may also extend to intentional or criminal acts committed by the employee."). But, the employee's act must still have been within the scope of his employment, meaning that "(1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer." *Id.* (citing Restatement (Second) of Agency § 228).

8.      The evidence adduced at trial does not establish the first prong. To the contrary, P. Hunter's unwelcome kiss of a subordinate employee was not conduct of a kind and nature that he was employed to perform. The Court therefore holds that Peace of Mind is not vicariously liable for the battery.

9.      Since the Court has found that P. Hunter caused a battery of Sims, it must now determine the amount of monetary damages that will fairly and adequately compensate Sims for all harm she sustained as a result. The Court's award must compensate Sims for damage sustained from the time of harm, as well as damage she will sustain in the future.

10.      Sims's Proposed Findings of Fact and Proposed Conclusions of Law argue that "Plaintiff is entitled to an award of compensatory damages that includes lost wages, mental anguish and embarrassment as result of the battery by Defendant Hunter and Defendant PML in an amount to be determined by this Court." (ECF No. 91, p. 18). But Sims did not adduce any evidence as to damages for lost wages, nor does the record show that any wages were lost as a result of the battery. Likewise, while Sims testified that she was uncomfortable and afraid at the time of the kiss, she did not adduce any evidence of physical harm or long-term (beyond the time immediately

following the kiss) mental harm or anguish caused by the kiss.   Nevertheless, "proof of the technical invasion of the integrity of the plaintiff's person by even an entirely harmless, but offensive, contact entitles the plaintiff to vindication of the legal right by an award of nominal damages, and the establishment of the tort cause of action entitles the plaintiff also to compensation for the resulting mental disturbance, such as fright, revulsion or humiliation." Prosser & Keeton, The Law of Torts 40.

11.    The Court finds that the record supports a determination that Sims suffered a short period of fear and distress as a result of the kiss.   No evidence was adduced showing any ongoing fear, distress, anguish or the like following the immediate incident.   Nevertheless, "[w]here it is proven that an unauthorized invasion of a person's physical integrity has occurred, even if harmless, the person is entitled to nominal damages." *Grabowski v. Quigley*, 684 A.2d 610, 615 (Pa. Super. 1996).   Thus, the Court awards damages to Sims in the amount of $100.00, to be paid by P. Hunter.

### III.    Conclusion

For the reasons set forth above, judgment will be entered in favor of Peace of Mind and against Sims at Count II.   Judgment will be entered in favor of Sims and against P. Hunter in the amount of $100.00 at Count III.   Appropriate orders of court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

12-1-2021
Dated